UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

SCOTTRADE, INC.,

                              Plaintiff,

        -against-

BROCO INVESTMENTS, INC. and VALERY MALTSEV,

                              Defendants,

      and

GENESIS INVESTMENTS, LLC,

                              Defendant/Garnishee.

------------------------------------------------------------

10 Civ. 03537 (RJH)

**MEMORANDUM OPINION AND ORDER**

Richard J. Holwell, District Judge:

      This action presents a surprising question of first impression.  Does a securities broker, whose customers have been defrauded, and who reimburses his customers—but to whom the customers have not assigned their claims, and who other than the reimbursements alleges no damages whatsoever—have standing to sue the alleged fraudsters for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Exchange Act Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Exchange Act Section 9(a), 15 U.S.C. § 78i(a)?  For the reasons discussed more fully below, and specifically because the Court concludes that the broker, Scottrade, Inc. ("Scottrade"), was not an "actual purchaser or seller of securities," the Court holds that the broker lacks standing to pursue those claims.  The Court thus dismisses the claims for violations of Section 10(b), Rule 10b-5, and Section

9(a). Scottrade's claim for rescission pursuant to Exchange Act Section 29(b), 15 U.S.C. § 78cc, is dismissed because Scottrade neither formed nor was in privity with a party to a contract in violation of the securities laws. Scottrade's claim for violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, is dismissed because defendant, Genesis Securities, LLC ("Genesis"), never accessed Scottrade's computers without authorization. Accordingly Genesis's motion to dismiss is GRANTED in its entirety, and Scottrade's motion for leave to amend its complaint is DENIED in its entirety.[1]

## I. FACTUAL SETTING

The following facts are taken as true for the purposes of the present motions.

**A. Background**

Plaintiff Scottrade, an Arizona corporation with its principal place of business in Missouri, is a securities broker-dealer registered with the United States Securities and Exchange Commission ("SEC"). (Proposed First Am. Compl. (hereinafter "FAC") ¶ 5.) As relevant to this action, Scottrade operates a website on which customers maintain accounts of securities and through which customers place orders to buy and sell securities. (*Id*. ¶ 6.) Defendant Genesis,[2] a New York limited liability company with its principal place of business in New York, is also a securities broker-dealer registered with

---

[1] Neither BroCo Investments, Inc. ("BroCo") nor Valery Maltsev has moved to dismiss or opposed Scottrade's motion for leave to amend. However, though the complaint was filed on ECF and a summons was issued (*see* ECF docket entry for Apr. 28, 2010), BroCo and Maltsev appear not to have been served with the complaint or with Scottrade's motion for leave to amend, nor has counsel for those parties appeared in this action. Accordingly the pending motions and this opinion apply only to Genesis.

[2] s/h/a Genesis Investments, LLC.

the SEC. (*Id.* ¶ 8.) Defendant BroCo Investments, Inc. ("BroCo") is a corporation organized under the laws of Mauritius. (*Id.* ¶ 7.) Defendant Valery Maltsev is BroCo's president. (*Id.*) BroCo is not licensed to operate as a broker in the United States, but appears to offer investment and/or brokerage services to its foreign customers. (*Id.* ¶ 11.) BroCo also maintained an investment account with Genesis (the "BroCo/Genesis Account), over which BroCo was the sole legal owner. (*Id.* ¶¶ 11, 13.) BroCo pooled its customers' funds in the BroCo/Genesis Account, and assigned its customers "user names" and trading limits with which the customers could order trades by contacting Genesis directly. (*Id.* ¶¶ 12, 13, 15.) BroCo, however, and not its customers, took formal responsibility for the trades in the account. (*Id.* ¶ 14.) Genesis would "regularly" generate reports of trading activity in the BroCo/Genesis Account and transmit those reports to BroCo. (*Id.* ¶ 15.)

Between August 2009 and March 2010, Valery Vitalievich Ksendzov—not a defendant in this action—allegedly carried out an elaborate "hack, pump, and dump" scheme by which he made upwards of $650,000 dollars. (*Id.* ¶ 19.) Ksendzov, a BroCo customer, would first purchase large blocks of thinly-traded domestic securities through the BroCo/Genesis Account. (*Id.* ¶ 17.) Ksendzov then hacked[3] into the online brokerage accounts of Scottrade's customers and entered huge numbers of buy orders in those Scottrade customer accounts for the thinly-traded securities held under his "user name" in the BroCo/Genesis Account. (*Id.* ¶¶ 17-19.) After the phony purchase orders drove up the price of the thinly traded securities, Ksendzov would liquidate his positions for returns on investment as high as 32,000 percent. (*Id.* ¶ 19.) The Scottrade customer

---

[3] "Essentially, hacking is the ability to bypass computer security protocols and gain access to computer systems." *United States v. Peterson*, 98 F.3d 502, 504 n.1 (9th Cir. 1996).

accounts were thereby presumably left with large amounts of worthless illiquid stock that had been purchased at prices far above its value.

Scottrade alleges that Ksendzov's "trading activit[y] so consistently resulted in levels of profitability that are unattainable in the absence of some form of fraud . . . [that defendants] Maltsev, BroCo and Genesis must have known, absent intentional disregard . . . that Ksendzov's trading involved some form of illegal market manipulation." (*Id.* ¶ 20.) Scottrade also alleges that BroCo and Genesis must have been aware of the fraud because Genesis would generate records of the trading activity in the BroCo/Genesis Account and forward those records to BroCo. (*Id.* ¶ 22.)

After learning of the fraud, Scottrade "restored the customers' accounts to the state they would have been in, but for the unauthorized transactions." (*Id.* ¶ 29.) The actual character of that restoration, however, is not clear from the FAC. Scottrade alleges it "incurred" $1,464,690 in "losses" in the process. (*Id.*)

**B.  Procedural History**

On March 15, 2010, the SEC brought suit against Maltsev and BroCo, but not against Genesis, seeking a preliminary injunction and related relief. (Compl. at 1, 9-11, *United States Securities and Exchange Commission v. BroCo Investments, Inc. and Valery Maltsev* (hereinafter "SEC Action"), (S.D.N.Y. Mar. 15, 2010) (No. 10 Civ. 2217).) Then on April 28, 2010, Scottrade filed its original complaint in this action asserting claims for violations of Sections 10(b), 9(a), and 29(b) of the Exchange Act, for violations of Rule 10b-5 promulgated thereunder, and for violations of the CFAA. On June 17, 2010, the Court granted the SEC a preliminary injunction in the SEC action.

(Tr. of Hr'g of June 17, 2010 (hereinafter "Oral Arg. Tr.") at 38.)  The injunction both froze BroCo and Maltsev's assets and prohibited future violations of the securities laws. (*Id*. at 47.)

Genesis moved to dismiss the complaint in this action on June 28, 2010.  After several extensions of the briefing schedule on that motion, but before Scottrade had filed any opposition papers, Genesis and Scottrade agreed to stay proceedings on the motion to dismiss pending judgment or dismissal of the SEC Action, or an order from the Court lifting the stay.  (Order of Sept. 28, 2010 at 1-2.)  On December 13, 2010, the SEC Action settled, and the Court lifted the stay and reinstated a briefing schedule the next day.  (Order of Dec. 14, 2010 at 1.)  Finally on January 11, 2011, Scottrade moved for leave to file an amended complaint based on new evidence revealed during the SEC action.  Genesis's opposition essentially tracks the same arguments as its motion to dismiss; and this opinion disposes of both motions.

## II.  DISCUSSION

### A.  Standard for Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  If the factual averments permit no reasonable inference stronger than the "mere

possibility of misconduct," the complaint should be dismissed. *Starr*, 592 F.3d at 321 (quoting *Iqbal*, 129 S. Ct. at 1950). Thus, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557). In applying this standard of facial plausibility, the Court accepts all factual allegations as true, but it does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Id*.

B. **Standard for Motion to Amend**

"A district court has broad discretion in determining whether to grant leave to amend [pleadings]." *Gurary v. Winehouse*, 235 F.R.D. 792, 801 (2d Cir. 2000). The court should freely grant leave to amend absent undue delay, bad faith, futility, dilatory motive, or undue prejudice. *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 603-04 (2d Cir. 2005). Futility, invoked here by defendants, turns on whether the additions state a claim that could withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

C. **Section 10(b) and Rule 10b-5 Claims**

   **Standing Requirement**

"It is axiomatic that in order to have standing, a 10b-5 plaintiff in a private damages action must have been either a purchaser or seller of the securities that form the basis of the [] deceptive conduct." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 404 (S.D.N.Y. 2005). The "actual purchaser or seller" rule, articulated by

the Second Circuit in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952), "was adopted by the Supreme Court as a bright-line rule in *Blue Chip Stamps v. Manor Drug Stores*, [421 U.S. 723 (1975)]." *In re Refco Captial Markets, Ltd. Brokerage Customer Sec. Litig.*, 586 F. Supp. 2d 172, 178-79 (S.D.N.Y. 2008). In *Blue Chip Stamps*, "[t]he Court specifically rejected a shifting and highly fact-oriented disposition of the issue of who may bring a damages claim for violation of Rule 10b-5 and stated that such an approach would not be a satisfactory basis for a rule of liability imposed on the conduct of business transactions." *Id.* at 179 (Lynch, J.) (internal quotation marks omitted).

Nowhere in its complaint does Scottrade allege that it purchased or sold any securities. Instead Scottrade seems to allege that it provided the interface and systems by which defendants' and Ksendzov's purchases and sales occurred, and which eventually caused harm to Scottrade's customers. (*See, e.g.*, FAC ¶ 6 ("Scottrade's customers initiate orders to purchase or sell securities for their Scottrade accounts using online interfaces."); ¶ 17 (Ksendzov "'hacked' into the online brokerage accounts of Scottrade's cusomters . . . to log on and enter orders to purchase the securities in which he had amassed a position. . . . [Ksendzov] had [no] authority to enter orders for the accounts of Scottrade's customers.").)[4] Indeed, Scottrade concedes that the losses were not felt by it

---

[4] (*See also* Compl. ¶ 1 ("The relief sought is intended to compensate Scottrade for the losses it sustained in consequence of a so-called 'hack, pump and dump' scheme conducted in part through securities transactions effected or controlled by [defendants]."); ¶ 3 ("Utilizing (without the owners' permission) user names and passwords that provide access to brokerage accounts of investors who handle their purchases and sales of securities through on-line interfaces with their brokerage firms' computers, perpetrators of 'hack, pump and dump' schemes place unauthorized orders to purchase shares of thinly traded securities for the brokerage accounts linked to the unwitting investors' user names."); ¶ 19 ("The trading initiated by Ksendzov and effected or controlled by Maltsev, BroCo and Genesis . . ."); ¶ 24 (Ksendzov "entered unauthorized orders directing Scottrade to effect for the accounts of Scottrade's customers the transactions described."); ¶ 28 (Scottrade "caused such orders to be executed."); ¶ 31 (". . . the transactions Scottrade effected (pursuant to Ksendzov's unauthorized orders) for the accounts of the Scottrade customers . . ."); ¶

due to its trading activity; but that those losses were instead the product of defendants' and Ksendzov's alleged scheme which used funds in accounts owned by Scottrade customers to purchase overvalued stock at increasingly inflated prices, and which left those accounts full of worthless stock.  (*See id*. ¶ 3 ("In effect, the perpetrators of 'hack, pump and dump' schemes steal money from the accounts in which the unauthorized orders have been placed.").)  Scottrade only felt losses because it "restored the customers' accounts to the state they would have been in, but for the unauthorized transactions[, and] Scottrade's losses incurred in doing so were at least $1,464,690."  (*Id*. ¶ 29.)

The Court is therefore essentially faced with two questions.  First, is Scottrade—an online broker that executed phony orders apparently placed by its customers, and then reimbursed its customers for those customers' losses on the trades—an "actual purchaser or seller" of securities in the traditional 10b-5 case?  And second, can Scottrade assert "actual purchaser or seller" standing under any other theory?

Surprisingly, the Second Circuit and no court in this district has addressed these questions.  But the Court finds the Second Circuit's decision in *Klein & Co. Futures, Inc. v. Board of Trade of the City of New York*, 464 F.3d 255 (2d Cir. 2006) ("*Klein II*"), and district court cases *In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.*, 586 F. Supp. 2d 172 (S.D.N.Y. 2008), and *Manufacturers Hanover Trust Co. v. Smith Barney, Harris Upham & Co., Inc.*, 770 F. Supp. 176 (S.D.N.Y. 1991), persuasive; and finds that Scottrade was not here an "actual purchaser or seller" of securities.

---

43 ("In reliance upon the authenticity of those orders, Scottrade effected purchases and sales of securities."). Paragraphs 24, 31, and 43 suggests a congruence between "effect[ing]" of unauthorized trades on the one hand, and buying or selling on the other.  As discussed in this opinion, *infra*, the two are not the same for the purposes of the "actual purchaser or seller" standing analysis.

In *Klein*, Klein was a "futures commission merchant . . . [that] facilitated the trading and fulfilled certain obligations of its customers who traded through the [Board of Trade of the City of New York ('NYBOT')]," essentially acting "as a broker or agent that earned commissions for handling its customers trades." *Klein II*, 464 F.3d at 257, 260. Klein's customers were required to maintain a certain level of equity in their accounts; and Klein was required, under federal statutes and NYBOT rules, to guarantee its customers' trades. *Klein & Co. Futures, Inc. v. Board of Trade of the City of New York*, No. 00 Civ. 5563, 2005 WL 427713, at *1 & n.6, *4 (S.D.N.Y. Feb. 18, 2005) ("*Klein I*"), *aff'd*, *Klein II*, 464 F.3d 255 (2d Cir. 2006). Norman Eisler and his company First West, one of Klein's customers, manipulated settlement prices on certain futures and options eventually leading to a $4.5 million deficit in First West's account with Klein. *Klein II*, 464 F.3d at 258. Klein, as guarantor, took the $4.5 million hit, which eventually put Klein out of business. *Klein I*, 2005 Wl 427713, at *2.

Klein sued Eisler, First West, the NYBOT, and several other entities, for *inter alia* anti-fraud violations of the Commodity Exchange Act ("CEA"). The district court (Daniels, J.) dismissed on standing grounds, *id*. at *4, and the Second Circuit affirmed. *Klein II*, 464 F.3d at 261-62. Section 22 of the CEA, like Section 10(b) and Rule 10b-5 of the Exchange Act, provides that "only *purchasers or sellers*" have standing. *Klein I*, 2005 WL 427713, at *3 (emphasis in original). Klein, however, was not a purchaser or seller of the options contracts at issue, nor did it own those contracts. *Klein II*, 464 F.3d at 260. Instead, "Klein functioned merely as a broker or agent" that "handl[ed] its customers' trades." *Id*. The trades at issue occurred on Klein's customers' accounts; no trading activity occurred on Klein's own account. *Id*. at 259 (citing *Klein I*, 2005 WL

9

427713, at *4). It was First West, not Klein, that initiated the trades, and Klein had nothing to do with those decisions. *Id.* at 262. Though Klein might have eventually had to guarantee account deficits, "Klein had no interest in any of the resulting profits or investments losses," resulting from First West's trades. *Id.* Accordingly, Klein's damages were not the product of its activity as a purchaser or seller of securities; "[q]uite simply, it did not suffer its damages in the course of its trading activities on a contract market." *Klein I*, 2005 WL 427713, at *4.

The case at bar presents the same standing requirement applied to almost the same factual scenario. Here, the alleged fraud of defendants and a non-defendant third party (Ksendzov) caused Scottrade's customers to engage in unauthorized purchases of securities. Though acting as a broker or agent that handled or "effected" customers' trades, much like Klein, Scottrade initiated no trades, did no trading activity itself, ordered no trades for its own account, and had no input concerning its customers' "decisions" to place orders. Furthermore, Scottrade had no direct interest in the resulting profits or losses on those trades; Scottrade's loss occurred only because it made its customers whole after those customers lost money due to, in part, Scottrade's own computer security failures. But as with the anti-fraud provisions of the CEA, standing under Section 10(b) requires that Scottrade itself have been an actual purchaser or seller of securities. *In re Refco*, 586 F. Supp. 2d at 178. Because Scottrade was not, it lacks standing in this case.

This holding finds support in this District's cases that have come closest to the issue when considering Section 10(b) claims. In *Manufacturers Hanover*, MHT was a

stock transfer agent[5] whose employee stole stock certificates owned by MHT's customer DTC and entrusted to MHT.  770 F. Supp. at 178.  The employee then canceled DTC's stock certificates, reissued certificates to himself, and sold the stock.  *Id*.  After discovering the fraud, MHT repurchased the stock in the market at its own expense of over $1 million, and returned that stock to DTC's account.  *Id*.  DTC assigned all claims to MHT.  *Id*.  MHT then sued the employee and the financial institutions that processed the employee's sales for Section 10(b) fraud, alleging *inter alia* that the institutions should have known fraud was afoot and would have been able to prevent the losses had they done proper investigations.  *Id*. at 178-79.

MHT argued it had standing as an actual purchaser or seller because (1) it stood in the shoes of DTC; (2) it possessed the stock certificates when they were stolen; (3) its employee's cancelation of the certificates operated as a securities sale; and (4) it was the sole injured party.  *Id*. at 180.  The court (Conner, J.) disagreed.  The Court found first that the facts did not present a purchase or sale of securities as much as a *theft* of stock certificates followed by a sale by the thief.  *Id*.  Noting that "[a] conversion of securities does not become a purchase or sale of securities merely because the bailee reimbursed the loss," . . . the court stated, "[a] fraudulent change in ownership" does not "constitute sufficient basis for finding a sale of securities," and accordingly MHT lacked "purchaser or seller" standing.  *Id*.  The Court went on to find that the fraud did not occur "in connection with" a purchase or sale of securities because "no investment decision [was] made by either DTC or MHT and no such decision was affected by any fraud on defendants' part."  *Id*. at 181.

---

[5] A "stock transfer agent" is "entrusted with the custody and care of publically traded stock certificates, in transferable form, by the owners or depositors of such stock certificates."  *Manufacturers Hanover*, 770 F. Supp. at 178.

11

As with *Manufacturers Hanover*, the fraud here involved no investment decision by Scottrade, no purchase or sale by Scottrade, and no losses for Scottrade other than due to its reimbursement of its clients. And like that case, Ksendzov's hacking activity sounds more in theft or conversion than in securities fraud; that Ksendzov used that theft to make profitable his own purchasing and selling activity does not, however, make *Scottrade* a purchaser or seller of securities.[6]

A different but relevant situation was presented in *In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.*, 586 F. Supp. 2d 172 (S.D.N.Y. 2008). There plaintiffs were holders of "non-discretionary trading accounts at RCM [a brokerage firm], which meant that any transaction made by RCM on [plaintiffs'] behalf required their advance approval." 586 F. Supp. 2d at 176. RCM, however, purchased and sold the securities in plaintiffs' accounts without plaintiffs' approval, leading to "hundreds of millions of dollars in losses" in those accounts. *Id*. at 176-77. The court (Lynch, J.) found that plaintiffs were not actual purchasers or sellers of securities, and therefore lacked standing under Section 10(b), because of the "key fact" that RCM's trading activity was not done for plaintiffs' benefit but instead for its own. *Id*. at 179.

Likewise here, Scottrade's customers' "trades," ordered by Ksendzov, were not made on *Scottrade's* behalf but instead on those customers' behalf. No trades were made for the benefit of Scottrade, the plaintiff here; and Scottrade bore the losses for those "trades" only because of its decision to make its customers whole. As Judge Lynch noted

---

[6] To paraphrase *Manufacturers Hanover*: Scottrade's customers entrusted their accounts' security to the custody of Scottrade. Scottrade employed certain computer security systems to ensure the security of those accounts. The damage suffered by the customers and Scottrade flowed not from a decision to buy or sell securities but rather from the decision of Scottrade to employ its particular computer security systems. The customers relied upon Scottrade who in turn relied upon its computer security systems. Any breach by Ksendzov of those systems is not by itself sufficient to establish the basis for a federal securities claim, at least not by the executing broker. *See* 700 F. Supp. at 182.

12

in *In re Refco*, "[i]n adopting the *Birnbaum* rule . . . the Supreme Court itself recognized that the bright-line purchaser-seller requirement, strictly applied, would exclude certain classes of potential plaintiffs who may have legitimate claims of injury." *Id*. at 180. Thus, "proper application of the [purchaser-seller rule] for standing to sue will undoubtedly prevent some otherwise meritorious claims from surviving motions to dismiss." *Id*. (citing *MBIA Ins. Corp. v. Spiegel Holdings, Inc.*, No. 03 Civ. 10097, 2004 WL 1944452, at *6 (S.D.N.Y. Aug. 31, 2004)). Accordingly, though Scottrade's decision to restore its customers' accounts might be admirable, Scottrade is not a purchaser or seller for purposes of Section 10(b).

Scottrade argues that "'there is authority in this [C]ircuit that a broker who purchases or sells as agent for his customer satisfies the purchaser-seller requirement.'" (Pl.'s Reply on Pl.'s Mot. to Amend (hereinafter "Pl.'s Reply") at 6 (quoting *Odette v. Shearson, Hammill & Co., Inc.*, 394 F. Supp. 946, 959 (S.D.N.Y. 1975).) But *Odette*—a 1975 case decided before the Supreme Court's decision in *Blue Chip Stamps*—and the other cases Scottrade cites do not present the situation at bar. *Odette* held that standing existed because, as noted in *In re Refco*, the broker was acting as principal for its own account. *Odette*, 394 F. Supp. at 959. The authority cited by *Odette* for the proposition that brokers acting as agents for customers might be purchasers was *A.T. Brod & Co. v. Perlow*, 375 F.2d 393 (2d Cir. 1967). But *A.T. Brod* found that the broker had standing because it purchased securities for its customers and then turned around and demanded payment from those customers before delivering the securities, who did not pay and thereby caused the broker to suffer a loss when it resold the securities in the market. 375 F.2d at 395, 397. This situation—where an eventually non-paying customer orders

13

securities and a broker buys the securities for the customer but takes a loss on its resale when the customer refuses to pay, or conversely where a clearing agent is required to guarantee a non-paying buyer's purchases and pay for and accept receipt from the seller of the securities involved for its own account—makes the broker or agent a "forced" or "compelled" purchaser or seller for purposes of Section 10(b) claims. *See Klein II*, 464 F.3d at 261; *Mishkin v. Ageloff*, No. 97 Civ. 2690, 1998 WL 651065, at *7 (S.D.N.Y. Sept. 23, 1998) (collecting cases). But a "forced" or "compelled" purchaser or seller's standing is an exception to the "actual purchaser or seller" rule. *Gordon Partners v. Blumenthal*, No. 02 Civ. 7377, 2007 WL 431864, at *11 (S.D.N.Y. Feb. 9, 2007) ("The forced sale doctrine relaxes the requirement that only traditional purchasers or sellers of securities have standing to bring a Section 10(b) claim.") (quoting *Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1498 (9th Cir. 1995)). In any event, it does not apply to this case. Here, Ksendzov stole control of Scottrade's customer's accounts to make unauthorized purchases through Scottrade's online interface. Scottrade did not, however, solicit those customers' orders, place the trades, acquire the securities, and then seek payment for them before turning the securities over to the customers. Nor did Scottrade pay Genesis or any other party for its customers' fraudulent orders.

Scottrade also cites to the District of Arizona's 1989 decision in *A.G. Edwards & Sons, Inc. v. Smith*, 736 F. Supp. 1030 (D. Ariz. 1989). That citation is similarly unhelpful because that case presented the same situation as *A.T. Brod*. *See A.G. Edwards*, 736 F. Supp. at 1032, 1034. Scottrade finally cites to *Epstein v. Haas Sec. Corp.*, 731 F. Supp. 1166 (S.D.N.Y. 1990). But that case held that a clearing broker, who purchases securities and holds them as collateral against amounts an ordering customer

owes his securities broker, has standing to sue the customer for unpaid debts. *Epstein*, 731 F. Supp. at 1183-84.  That is not this case.

Because Scottrade does not satisfy the "actual purchaser or seller" standing requirement for Section 10(b) and Rule 10b-5 actions, those claims must be dismissed.

### D.  Section 9(a) Claim

In addition to its claims under Section 10(b) and Rule 10b-5, Scottrade brings claims under Section 9(a) of the Exchange Act.  Section 9(a) "makes it 'unlawful for any person, . . . [f]or the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or a false or misleading appearance with respect to the market for any such security,' to engage in certain deceptive practices, in order to 'induce the purchase or sale of any security . . . .'" *Lowe v. Salomon Smith Barney, Inc.*, 206 F. Supp. 2d 442, 444 (W.D.N.Y. 2002) (quoting 15 U.S.C. § 78i(a)).  Section 9(f) creates a private right of action, stating,

> Any person who willfully participates in any act or transaction in violation of subsections (a), (b), or (c) of this section, shall be liable to any person who shall purchase or sell any security at a price which was affected by such act or transaction, and the person so injured may sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction.

15 U.S.C. § 78i(f).[7]  Like Section 10(b) claims, however, standing under Section 9(f) requires that plaintiff have purchased or sold the securities in question.  *Lowe*, 206 F. Supp. 2d at 444 ("It has long been held that ¶ 9([f]) does *not* apply where there is no allegation that the plaintiff has either bought or sold stock at a price that was affected by

---

[7] Effective July 22, 2010, the private right of action is contained at Section 9(f), 15 U.S.C. § 78i(f).  Previously that action was contained at Section 9(e), 15 U.S.C. § 78i(e), which is the section Scottrade invokes.  (FAC ¶ 49.)

15

defendants' actions.") (emphasis in original and collecting cases).  Thus, because Scottrade was not a purchaser or seller of securities, it lacks standing to bring its Section 9(a) claims.

### E.  Section 29(b) Claim

Scottrade also seeks rescission under Exchange Act Section 29(b), 15 U.S.C. § 78cc(b), of all trades in which a Scottrade customer was a counterparty to Genesis.  (FAC ¶ 54.)  Section 29(b) states,

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void . . .

15 U.S.C. § 78cc(b).  "To establish a violation of Section 29(b), the plaintiff[] must show that (1) the contract involved a prohibited transaction, (2) [it is] in contractual privity with the defendant[s], and (3) [it is] in the class of persons the Act was designed to protect."  *Frati v. Saltzstein*, No. 10 Civ. 3255, 2011 WL 1002417, at *5 (S.D.N.Y. Mar. 14, 2011).  To demonstrate contractual privity with defendants for purposes of Section 29(b), "plaintiff must be a party to a contract or in privity with a party to a contract that violates [the] securit[ies] law[s]."  *McGowan Investors LP v. Frucher*, 481 F. Supp. 2d 405, 412 (E.D. Pa. 2007).

Scottrade's claim fails because, quite simply, no contract was ever made between it and Genesis or between its customers and Genesis pursuant to which Scottrade might claim privity.  Indeed, all the traditional elements of a contract—including "offer, acceptance, consideration, mutual assent and intent to be bound," *Benicorp Ins. Co. v.*

*Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006)—are missing. Though Section 29(b) would allow Scottrade to rescind a fraudulent contract concerning its property and to which it was party, that section does not allow Scottrade to rescind a contract concerning property that has been stolen from it (or its customers) and to which it was not a party. That claim sounds in conversion, not in securities fraud or contract law.[8]

### F. Computer Fraud and Abuse Act Claim

Scottrade finally brings claims under the CFAA, 18 U.S.C. § 1030(a). (FAC ¶ 58.) As relevant to this opinion, Section 1030 makes unlawful "knowingly and with intent to defraud, access[ing] a protected computer without authorization . . . and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value." 18 U.S.C. § 1030(a)(4). Thus to maintain its CFAA claim against Genesis, Scottrade must plead, *inter alia*, "factual content showing that . . . [Genesis] accessed a protected computer without authorization or in excess of [its] authorization." *Cenveo, Inc. v. Rao*, 659 F. Supp. 2d 312, 316 (D. Conn. 2009); *see also Motown Record Co., L.P. v. Kovalcik*, No. 07-CV-4702, 2009 WL 455137, at *3 (E.D. Pa. Feb. 23, 2009) ("a claim under 18 U.S.C. § 1030(a)(4) has four elements: (1) a defendant has accessed a protected computer; (2) has done so without authorization or by exceeding such authorization as was granted; (3) has done so knowingly and with intent to defraud; and (4) as a result has

---

[8] In addition to the lack of any contract, the parties appear to agree that a claim for rescission under Section 29(b) requires at least that plaintiff plead an underlying violation of the Exchange Act. (*See* Def.'s Opp'n to Pl.'s Mot. to Amend at 17 ("A claim for recission requires the plaintiff to allege a primary violation of Section 10(b)."); Pl.'s Reply at 16 ("Section 29(b) . . . provides that a contract made in violation of the Exchange Act may be rescinded. . . . Genesis challenges the rescission claim solely on the grounds that the [FAC] fails to plead a primary violation of Section 10(b). For all of the reasons discussed herein, Genesis' argument fails.") (internal citation omitted).) As Scottrade has failed to plead any underlying Exchange Act violation against Genesis, Scottrade's claim for rescission against Genesis must therefore be dismissed.

17

furthered the intended fraud and obtained anything of value.") (internal quotation marks omitted)).

Scottrade concedes that *Genesis* did not access its computer systems without authorization. (Pl.'s Reply at 18 ("Scottrade's computers were hacked without authorization . . . [and] Ksendzov, BroCo, and/or Genesis acted in concert to engage in the 'hack, pump and dump' scheme.").) Scottrade argues, however, that since Genesis allegedly was involved in and benefitted from the fraudulent scheme, it has "an actionable claim against Genesis" under the CFAA. (*Id*.)

Scottrade is incorrect. The CFAA is primarily a criminal statute—the statute allows for a private civil action alleging a violation of Section 1030(a)(4) at Section 1030(g)—and as such, any ambiguity concerning its scope "should be resolved in favor of lenity." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134 (9th Cir. 2009); *see also University Sports Pub. Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 384 (S.D.N.Y. 2010) ("because the CFAA is principally a criminal statute, the rule of lenity requires courts to interpret it narrowly. Thus, to the extent the statute is ambiguous . . . , that ambiguity must be resolved in a defendant's favor."). And when a statute has both civil and criminal application, this rule of lenity must be applied consistently to both. *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *University Sports*, 725 F. Supp. 2d at 384-85 (finding that "the rule of lenity counsels a narrow reading" of the CFAA in a civil case). Because Scottrade does not allege that Genesis hacked into its systems, or otherwise accessed its computers without authorization, Scottrade's CFAA claim against Genesis fails and must be dismissed.

### G. Leave to Amend

Scottrade's original and proposed amended complaints contain the same allegations relating to standing, Ksendzov's transactions and activities, and Genesis's lack of hacking activity. Accordingly, as the Court grants Genesis's motion to dismiss, it likewise denies Scottrade's motion for leave to amend as futile. *Cf. In re Refco*, 586 F. Supp. 2d at 174, 196 (denying leave to replead and dismissing claims with prejudice when allegations demonstrated that plaintiffs lacked standing to bring securities fraud claims, and when plaintiffs could not cure pleading deficiencies).

### III. CONCLUSION

For the reasons stated above, Genesis's motion to dismiss is GRANTED in its entirety, and all claims asserted against Genesis in this action are dismissed with prejudice. Scottrade's motion for leave to amend is DENIED in its entirety. The Clerk of the Court is directed to close these motions [14], [25].

SO ORDERED

Dated: New York, New York
       March 30, 2011

_____
Richard J. Holwell
United States District Judge